UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDO LUFTU ALI,

    *Plaintiff*,

v.

MARCO RUBIO,

    *Defendant*.

Civil Action No. 1:22-cv-02786 (CJN)

**MEMORANDUM OPINION**

    Over the course of 20 years, the government issued Plaintiff Abdo Ali three U.S. passports. In 2019, however, the government took the position that Plaintiff is not (and was never) a U.S. citizen and revoked his passport. Plaintiff brought this suit seeking a declaration that he is a citizen. The government moves for summary judgment, *see generally* ECF 19, and although Plaintiff does not style his response as a cross-motion for summary judgment, he asks the court to enter judgment in his favor and to reverse the revocation of his passport, *see* ECF 20 at 26. The Court concludes that it can consider the government's exhibits, that those exhibits prove Plaintiff is not a U.S. citizen, and that the Court therefore must grant the government's motion.

**I. Background**

    Plaintiff's father, Luftu Ali, entered the United States in 1963 and became a U.S. citizen in 1969. Plaintiff was born in Yemen ten years later. Under then-existing law—as to which there is no dispute in this case—a child born abroad to a U.S.-citizen parent received citizenship only if the parent had, at any time before the child's birth, been physically present in the United States for ten years. *See* 8 U.S.C. § 1401(g) (1978).

1

In 1990, Plaintiff applied for a U.S. passport based on his father's citizenship. The government—perhaps assuming that Plaintiff's father had lived in the United States between 1969 and 1979—gave Plaintiff a passport. Plaintiff used that passport to enter the United States in 1994, then successfully sought a passport renewal in 1999. *See* ECF 1 at 2.

In 2005, Plaintiff applied for a certificate of citizenship. The government determined that his father had resided in the United States for fewer than ten years as of 1979 and so was ineligible to transmit citizenship to Plaintiff at birth. *See* ECF 19-19 at *6. Accordingly, it denied Plaintiff's application. Plaintiff remained in the country, however, and in 2009 the government gave him another passport.

In 2019, Plaintiff sought a third passport renewal. Apparently remembering its earlier determination as to Plaintiff's citizenship status, the government refused to issue him a new passport and revoked his existing one. *See* ECF 19-20. Plaintiff sued under 28 U.S.C. § 2201, seeking a judgment declaring him to be a U.S. citizen. The government denies that Plaintiff is a citizen and directs the Court to evidence showing that, as of Plaintiff's birth, his father had accumulated (at most) seven years of physical presence in the United States.

## II. Analysis

Plaintiff's cause of action arises under 8 U.S.C. § 1503(a), which allows an individual in the United States who claims a right as a U.S. citizen, but who is denied that right on the ground that he is not a U.S. citizen, to sue the government and seek a declaration that he is in fact a citizen. Plaintiff bears the burden of making a *prima facie* showing of citizenship. *Xia v. Tillerson*, 865 F.3d 643, 656 (D.C. Cir. 2017). The Court of Appeals has indicated, and the government does not appear to dispute, that Plaintiff's (now-revoked) passport satisfies that "minimal" burden. *Id.* The

2

burden therefore shifts to the government, which must show by clear and convincing evidence that Plaintiff did not receive U.S. citizenship from his father. *See id.*

The core of Plaintiff's argument is not that his father met the ten-year requirement; rather, it is that the Court cannot consider most of the government's evidence showing otherwise. He premises that argument on the rule that, in deciding a motion for summary judgment, the Court can consider only evidence that is "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *see also* FED. R. CIV. P. 56(c)(2). According to Plaintiff, the government could not make its evidence admissible at trial and so has failed to meet its burden.

Before determining whether the government's evidence could be admitted at trial, the Court will lay out the substance of that evidence. The government's exhibits include: bank, wage, and tax records showing activity in the United States that ceased in 1968, *see* ECF 19-5 & 19-8; a 1979 letter sent by the U.S. Embassy in Yemen to Plaintiff's father informing him that he might lose his citizenship as a result of establishing permanent residence in Yemen, *see* ECF 19-14; and Plaintiff's response to an interrogatory in which he states that his father had six children between 1972 and 1978, all of whom were born in Yemen, *see* ECF 19-15 at 6.

But the most probative of the government's exhibits are three documents purportedly created by Plaintiff's father himself. The first is an affidavit submitted in support of a passport application for one of Plaintiff's brothers. In that affidavit, Plaintiff's father listed, as his dates of physical presence in the United States, 1963 to 1965, 1966 to 1969, and from 1979 onwards. ECF 19-4 at *4. The other two documents are Plaintiff's father's own passport applications, submitted to the U.S. Embassy in Yemen in 1974 and 1979. The 1974 application lists the same dates as the affidavit. *See* ECF 19-12 at *2. The 1979 application states that Plaintiff's father left for Yemen

3

in 1971, rather than—as indicated by the rest of the government's evidence—in 1969. *See* ECF 19-13 at \*4 & \*6.

The parties focus on those three documents; the Court will do the same, because the statements in those documents are the clearest evidence of the father's time abroad. They conclusively establish that, as of 1979, Plaintiff's father had been physically present in the United States only from 1963 to 1965 and from 1966 to, at the latest, 1971—a total of seven years. Thus, if the Court can consider those statements, it must hold that the government has proven that Plaintiff's father resided in the United States for fewer than ten years as of 1979 and therefore could not transfer citizenship to Plaintiff at birth. Plaintiff argues that the statements could not be made admissible at trial because they would be unauthenticated, inadmissible hearsay, and barred by equitable doctrines.

A.   **Authentication**

The parties spill a great deal of ink debating whether the documents are self-authenticating under Federal Rule of Evidence 902(11). But they need not be self-authenticating; a document can be authenticated with external evidence showing that it "is what the proponent claims it is." FED. R. EVID. 901(a). The government has presented sworn declarations by the custodians of the documents certifying that they are true copies of original records in the government's custody. *See* ECF 22-2. That suffices to meet the government's low burden of authentication, *see Klayman v. Jud. Watch,* 297 F. Supp. 3d 80, 84 (D.D.C. 2018)—and, notably, that method of authenticating documents filed in a public office is explicitly embraced by Federal Rule of Evidence 901(b)(7).[1]

---

[1] Were this case to go to trial, the government could also authenticate the passport applications as ancient documents. *See* FED. R. EVID. 901(b)(8); *see also Gleklen*, 199 F.3d at 1369.

4

**B.     Hearsay**

Plaintiff also argues that the statements are hearsay.  The Court agrees; the government seeks to use those out-of-court statements to demonstrate their truth.  *See Smith v. Arizona*, 602 U.S. 779, 785 (2024).  But the government proposes three hearsay exceptions under which the statements might nonetheless be admissible.

Business Records.  The government's first attempt is the exception for records "kept in the course of a regularly conducted activity of" an organization.  *See* FED. R. EVID. 803(6).  But that exception generally applies to statements made by employees of the organization.  If the statements were instead provided to the organization (here, the government) by an outsider (here, Plaintiff's father), then they are admissible only on "a showing that the outsider had a duty to report the information, or that it was standard practice for the preparer to verify information from outside sources."  *United States v. Gurr*, 471 F.3d 144, 152 (D.C. Cir. 2006) (citation omitted).  The government has not shown that either of those requirements is met.

Ancient Documents.  The government's second attempt is more successful, however.  The Court concludes that the passport applications would be admissible at trial under Federal Rule of Evidence 803(16).  That rule, the so-called ancient-documents hearsay exception, makes admissible hearsay contained "in a document that was prepared before January 1, 1998, and whose authenticity is established."  The documents containing Plaintiff's father's statements were prepared long before 1998, and the Court has already held that the documents are authentic (and could be further authenticated at trial if necessary).

Residual Exception.  The Court also agrees that Plaintiff's father's statements would be admissible under the residual exception in Federal Rule of Evidence 807.  That narrow exception

5

allows the admission of otherwise-inadmissible hearsay under three conditions, all of which are met here.

First, the statement must be "supported by sufficient guarantees of trustworthiness—after considering the totality of the circumstances under which it was made and evidence, if any, corroborating the statement." FED. R. EVID. 807(a)(1). Statements in passport applications are inherently more reliable than most other hearsay because the proponent has strong reasons to be truthful and precise. Indeed, willfully lying in a passport application would have exposed Plaintiff's father to criminal prosecution, *see* 18 U.S.C. § 1542 (1970), which makes his statements more trustworthy, *cf. United States v. Slatten*, 865 F.3d 767, 808 (D.C. Cir. 2017). Moreover, there is ample evidence—including stamps in the father's passports, *see* ECF 19-7, the father's bank and employment records, and Plaintiff's response about where his older siblings were born—to corroborate the statements in the documents that Plaintiff's father left the United States from 1965 to 1966 and from, at the latest, 1971 to 1979.

Second, the statement must be "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." FED. R. EVID. 807(a)(2). Because Plaintiff's father died decades ago, his out-of-court statements could not be replaced by in-court testimony, and Plaintiff does not suggest any other evidence that would be more probative of his father's presence in the United States than his father's own statements.

Third, the proponent must give the adverse party "reasonable notice of the intent to offer the statement … so that the party has a fair opportunity to meet it." FED. R. EVID. 807(b). Plaintiff argues that the government did not put him on notice that his father's presence would be important until after his father died. But the notice requirement does not turn on whether the party against whom the evidence is offered has a chance to cross-examine the declarant. *See Cynergy, LLC v.*

6

*First American Title Ins.*, 706 F.3d 1321, 1330 (11th Cir. 2013) ("The notice requirement … does not create a categorical ban on the admission of statements made by deceased persons."). Rather, the requirement goes to a more general question: Whether the party has "an opportunity to attack the trustworthiness of the evidence." *Piva v. Xerox Corp.*, 654 F.2d 591, 596 (9th Cir. 1981). That requirement is satisfied here, where the government presented the evidence in its summary judgment motion and where Plaintiff was able to (and did) challenge it in his brief. And more to the point, the notice requirement would be met were this case to go to trial; Plaintiff would have received notice "in writing before the trial or hearing," FED. R. EVID. 807(b), of the government's intent to offer the statements. *Id.*

English Literacy. One hearsay issue remains. Plaintiff argues that the statements purportedly made by his father could not have been made by him because the statements are written in English. Plaintiff presents sworn declarations from himself and from his cousin-in-law stating that his father did not speak English and often asked for translations to Arabic. ECF 20 at 28–32. Plaintiff does not appear to argue that the documents, or the signatures on them, are forgeries.[2] Rather, Plaintiff thinks someone else must have prepared the documents on his father's behalf. *See* ECF 23-2 at 10.

Even assuming an interpreter aided Plaintiff's father in completing the applications, however, they would still be admissible. True, adding an interpreter might add a level of hearsay; the father's statements to the interpreter would be hearsay, as might the interpreters' transcription of those statements in the written applications. But although each level of hearsay would require its own hearsay exception, *see* FED. R. EVID. 805, the Court can conceive of no reason (and Plaintiff

---

[2] Nor could the Court justifiably draw such an inference. Plaintiff points to no one who would have enough information, let alone a motive, to impersonate his father and submit passport applications on his (and his child's) behalf over the course of more than a decade.

has not pointed to one) to think that either the ancient-documents exception or the residual exception would apply to only one level of hearsay. Moreover, to the extent the interpreter was, for example, an embassy official regularly engaged in helping foreign citizens fill out documents, the business records exception would be back in play.

### C.    Equitable Doctrines

In a prior case, Plaintiff argued that, because the government did not revoke his passport until after his father's death, it should now be barred from doing so under the doctrines of laches and equitable estoppel. *See Ali v. Dep't of State*, No. 20-cv-1436 (RJL) (D.D.C.), ECF 1 at 5–8. Judge Leon disagreed in that prior case, *see Ali*, No. 20-cv-1436, ECF 11 at 7–9, based on the well-established rule that "courts have no power to confer citizenship where it otherwise does not exist under the laws of the United States," *Muthana v. Pompeo*, 985 F.3d 893, 903 (D.C. Cir. 2021).

Plaintiff now presents a twist on that argument. Rather than asking the Court directly to bar the passport revocation, he instead asks that it invoke laches and equitable estoppel to forbid the government from introducing evidence as to his non-citizenship. But even assuming those doctrines could sometimes be used to bar evidence, this would not be one such case. No matter how Plaintiff frames his argument, what he asks the Court to do is invoke equitable doctrines to declare that he is a U.S. citizen. (Indeed, that is the only relief authorized by 8 U.S.C. § 1503.) But having determined that Plaintiff "does not qualify for citizenship," the Court "has no discretion to ignore the defect and grant citizenship" *I.N.S. v. Pangilinan*, 486 U.S. 875, 884 (1988) (quoting *Fedorenko v. United States*, 449 U.S. 490, 517 (1981))—whether "by application of the doctrine of estoppel, [or] by invocation of equitable powers, [or] by any other means," *id.* at 885.

8

**Conclusion**

The Court can consider the evidence presented, and that evidence establishes beyond any dispute of material fact that Plaintiff did not receive U.S. citizenship from his father. The Court therefore grants the government's motion for summary judgment and dismisses the case. A separate order will issue contemporaneously with this opinion.

DATE: January 24, 2025

                                                 CARL J. NICHOLS
                                                 United States District Judge